**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John GARCIA (86–6110), and Alan David Wolfe (86–6111), Defendants–Appellants.**

**Nos. 86–6110, 86–6111.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 18, 1987.

Decided Jan. 10, 1989.

January 1, 1989.

148

Steven Jugo, Miami, Fla., Kathryn Murphy (argued), for John Garcia.

Andrew T. Coiner (argued), Lexington, Ky., for Alan David Wolfe.

Louis DeFalaise, U.S. Atty., Lexington, Ky., Barbara Edelman (argued), for U.S.

Before: GUY and BOGGS, Circuit Judges; and SUHRHEINRICH, District Judge.[*]

BOGGS, Circuit Judge.

John Garcia and Alan David Wolfe appeal their convictions, after a jury trial, for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Garcia specifically appeals the denial of his motion to suppress the cocaine found pursuant to the search of his luggage, which he claims violated the fourth amendment.

[*] The Honorable Richard Suhrheinrich, United States District Judge for the Eastern District of Michigan, sitting by designation.

Wolfe challenges the admission of testimony regarding his breeding of pit bulls for sale to drug dealers, as well as the sufficiency of the evidence in general. We affirm the trial court's decisions, finding that the district court was correct in determining that: (1) the search of Garcia's luggage was consensual; (2) the admission of testimony regarding Wolfe's breeding and sale of pit bulls was error, but that the error was harmless; and (3) the evidence was sufficient to support Wolfe's conviction.

## I

John Garcia and Alan David Wolfe were found guilty after a jury trial in the Eastern District of Kentucky of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).

Garcia and Wolfe were stopped by Agents William Engelman and Michael Starnes of the drug unit of the Hamilton County Sheriff's Department at the Greater Cincinnati Airport as they were arriving on an early morning flight from Miami. The agents' suspicions appeared to be aroused mainly by the defendants' attire. They were both wearing black t-shirts and bib overalls in contrast to the majority of business travellers, who wore suits. The agents followed the defendants to the baggage claim area where Wolfe rented a car from Budget Car Rental after going to several different car rental booths. Garcia waited for Wolfe by leaning against a railing a short distance away. Neither man claimed any baggage; they were both carrying gym bags as carry-on luggage. They had walked at a normal pace through the airport, but Agent Engelman testified that Garcia appeared nervous and kept glancing over his shoulder, and that he continued to glance at Engelman during the time he was waiting for Wolfe. Garcia testified that he was merely watching the woman with whom Engelman was talking.

Wolfe signalled to Garcia after renting the car and they proceeded to the parking lot to pick up the car, followed by the agents. When they located the car, Garcia placed his bag on the back passenger seat. At that point, the agents approached the defendants and identified themselves as police. They asked to see identification and plane tickets. Garcia's ticket indicated that he had a ticket for a return flight to Miami later that day, although he told Engelman that he was not returning until the next day. Engelman asked if Garcia knew anything about drug trafficking through the airport to which Garcia replied in the negative.

Wolfe consented to a search of his carry-on luggage, which revealed nothing connected to drugs. However, he was carrying $4000 in cash when he was arrested. Garcia's consent to the search of his gym bag is in dispute. Garcia testified that Engelman asked him: "Can I search your luggage?" and he replied: "No." Engelman testified that he asked Garcia: "Would you mind if I looked through your luggage?" to which Garcia replied: "No." Engelman also testified that the standard consent request suggested by DEA agents was: "Will you give us consent to search your luggage?" Garcia refused to sign a consent form after the search was completed. Engelman reported the exchange verbally to DEA agent William Modesitt, who filed a written report stating the "Detective Engelman asked GARCIA for permission to search his person and his luggage. GARCIA states, 'YES.'" The search of Garcia's bag revealed four plastic bags inside the pocket of a grey vest, containing 1,168 grams of cocaine. Defendants were then arrested and taken to the airport police station.

## II

Garcia argues first that the magistrate and the trial court erred in denying his motion to suppress because the government did not carry its burden of proving consent. He claims that the agents did not have a warrant to search his bags and did not have probable cause for an arrest at the time they searched the bag. Thus, Garcia alleges that the warrantless search violated his fourth amendment rights, and that the evidence obtained therefrom should have been suppressed. Garcia further argues that the burden of proving that

consent was freely and voluntarily given is on the government, *Schneckloth v. Busta-monte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973), and that it did not meet that burden in this case because of the confusion surrounding Engelman's question and Garcia's answer.

The principles governing the permissibility of searches of this type are reasonably clear. It is the application of these principles to the infinite variety of specific and very slightly differing facts that arise in the airport search context that has caused this and other circuits to grapple repeatedly with such cases. In *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968), and its progeny, the Supreme Court laid down the principle that police can make a brief stop or detention based on an articulable suspicion that amounts to less than probable cause. In *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), the Court also made clear that police officers can, for any reason, approach a person and merely request to speak to the citizen.

■■■ In the airport stop context, it is also clear that an officer may approach a traveller and request to speak to him, and may continue that conversation up to the point that a reasonable person would no longer feel that the person was free to go. *Ibid.* Once that point of detention has been reached, the officers must have a reasonable articulable suspicion, or else the stop or detention is illegal, and fruits of that search must be suppressed. *Id.* at 549, 100 S.Ct. at 1874; *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980). Consent to any search subsequent to a *Terry*-stop must be proven by clear and positive testimony, *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977); *United States v. Williams*, 754 F.2d 672, 675 (6th Cir.1985), and must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion. *McCaleb*, 552 F.2d at 721. Thus, we must first determine whether the initial contact between Garcia and the agents was permissible; whether any subsequent de-

tention was supported by a reasonable, articulable suspicion. *Mendenhall*, 446 U.S. at 549, 100 S.Ct. at 1874; and, finally, whether the resulting warrantless search of Garcia's bag was consented to, as we believe it was.

*United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), is generally thought to be the leading case on this issue. In *Mendenhall*, the Court stated that a "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." 446 U.S. at 553, 100 S.Ct. at 1876. There, DEA agents, after watching the defendant leave a commercial airplane and act in ways "characteristic of persons unlawfully carrying narcotics," approached the defendant, identified themselves as DEA agents, and asked her for identification and her airline ticket. *Id.* at 547–48, 100 S.Ct. at 1873–74. The Court found that the defendant possessed the "constitutional right of personal security as she walked through the airport." *Id.* at 550, 100 S.Ct. at 1875. The Court listed a number of circumstances that might indicate that a seizure had occurred. These include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Ibid.* Obviously, none of these is present in this case.

These guidelines have been followed by this Circuit in a number of cases. For example, in *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), the defendant was first approached by DEA agents in Atlanta, where she was to board a connecting flight to Detroit. *Id.* at 1043. The agents approached her after observing what they perceived as suspicious behavior, identified themselves, and asked to see the defendant's identification and airline ticket. The defendant complied. After some discussion, the defendant was allowed to board her connecting flight. When she arrived in Detroit, agents were waiting for her. This time, the defendant was asked to accompany the agents to the DEA office and she

abandoned what later was determined to be her luggage. *Id.* at 1044. This court held that the contact in Atlanta was *not* a seizure, while the contact in Detroit was. *Id.* at 1046. The determining factor was that, in Atlanta, the defendant reasonably could have believed that she was free to go; but in Detroit, she could not. *Id.*

In *United States v. Knox,* 839 F.2d 285 (6th Cir.1988), this court again applied the *Mendenhall* rules to determine whether a seizure had occurred. This court held that a seizure had occurred when agents and police approached the defendant and asked him to accompany them for questioning. *Id.* at 289. The same was true in *United States v. Saperstein,* 723 F.2d 1221 (6th Cir.1983), in which, first, the agent accused the defendant of trafficking in narcotics while that agent stood between the defendant and any transportation; and, then, a second agent asked the defendant to accompany the two agents to the DEA office. *Id.* at 1226.

Thus, the one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place to which the defendant had not planned to go. This was the case in both *United States v. Lucci,* 758 F.2d 153, 155 (6th Cir.1985), and *United States v. Jefferson,* 650 F.2d 854, 856 (6th Cir. 1981)—the only other cases in which this court has found that a seizure occurred. Otherwise, this court has not held that a seizure has occurred and, thus, that fourth amendment guarantees have not been implicated.

In *United States v. Collis,* 766 F.2d 219 (6th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985), and *United States v. Moore,* 675 F.2d 802 (6th Cir. 1982), in circumstances similar to those in the instant case, this court held that a seizure had not occurred. In *Collis,* an agent on duty at an airport approached the defendant from behind, lightly tapped him on the arm, identified himself, asked if he could ask some questions, and, after the defendant had produced a credit card and his airline ticket, asked about the defend-

ant's luggage and for further identification. 766 F.2d at 219–21. This exchange is, if anything, lengthier and more intrusive than the one in this case. However, this court found that no seizure had occurred, stating that "[a]bsent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled ..." there has been no seizure. *Id.* at 221.

In *Moore,* the agents were watching the Detroit airport for signs of suspicious activity when the defendant arrived on a flight from Fort Lauderdale. 675 F.2d at 803. The defendant was one of the first passengers to leave the airplane, and the agents assumed that this meant that he had been traveling first class. When the defendant left the terminal without stopping for any luggage and walked to the taxicab area *outside the terminal,* the agent identified himself and asked if he could talk with the defendant. He then asked for identification. In holding that no seizure had occurred, this court distinguished *Moore* from *Jefferson,* explaining that the difference was that, in *Moore,* the agent had *asked* the defendant if he could ask him a few questions, *id.* at 807, while in *Jefferson,* the defendant was asked to accompany the police to the baggage claim office immediately after stopping him. 650 F.2d at 856. This contact occurred outside the terminal and this court still found that it was permissible. *Id.*

This review of the precedents leads us to conclude that the initial stop and the subsequent search of Garcia's bag were consensual. Clearly, the stop and early questioning were permissible under *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Further, both the magistrate and the trial judge found *as fact* that the agent's testimony established Garcia's consent, despite Garcia's testimony to the contrary. As a finding of fact, it is subject to the "clearly erroneous" standard of review. Fed.R. Civ.P. 52(a); *United States v. Coleman,* 628 F.2d 961, 963 (6th Cir.1980). We have here a swearing contest, a contest between the defendant's testimony and that of a police officer. In such a case, we see no justification for disturbing the finding of

the trial judge, whose opportunity to observe the witnesses' demeanor renders his judgment as to their credibility superior to that of any appellate tribunal.

We cannot say that this finding of consent was clearly erroneous. There were only two guards present, no weapon was displayed, there was no physical touching of Garcia, the agents did not raise their voices or threaten Garcia in any way. Thus, none of the *Mendenhall* factors is present here. 446 U.S. at 550, 100 S.Ct. at 1875. Garcia does not challenge the initial stop, and information gathered during that stop, including a discrepancy between Garcia's ticket and his story, heightened the agents' suspicion that Garcia and Wolfe were engaged in illegal activity.

Thus, in this case, the factors generally militate in favor of the conclusion that there was a permissible conversation, up to the point that the answers given by Garcia and Wolfe gave rise to a reasonable, articulable suspicion. These further conversations led to Garcia's consent to the search of his bag, which gave the agents probable cause to arrest the defendants. Thus, we find no constitutional violation and affirm.

### III

■ We now turn to an examination of Wolfe's claims. Wolfe claims that the evidence was insufficient to prove that he had constructive possession or knowledge of the cocaine in Garcia's bag, which was necessary to support Wolfe's conviction. The standard we must apply in determining the validity of Wolfe's claim is whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560

First, we must agree with the government that, because Wolfe was convicted only of aiding and abetting, all that is necessary to support a conviction is evidence that Wolfe associated himself with, and in some sense attempted to help bring about, the result Garcia sought. *United*

*States v. Zackert*, 783 F.2d 677, 678 (6th Cir.1986).

In this case, Wolfe travelled from Miami with Garcia; split up with Garcia in the airline terminal but was seen making signals to him; possessed $4000 in cash when arrested; planned that Garcia would be staying at his house overnight, as Garcia had done before; and stayed at Garcia's house in Miami the night before. This was more than enough evidence to link the two men in Garcia's enterprise. In addition, because Wolfe chose to testify, the jury had an opportunity to judge his credibility, and was entitled to consider any lack of credibility in reaching its verdict. *United States v. Cotton*, 770 F.2d 940, 945 (11th Cir.1985); *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir.1985).

### IV

Wolfe's final claim is that he should not have been questioned regarding his knowledge that pit bulls, which he bred, were used to guard drug dealers and their stashes. He claims that this line of questioning is irrelevant and prejudicial in violation of Fed.R.Evid. 403.

■ The government argues, to our satisfaction, that these questions were proper, or at least harmless. Wolfe testified on direct examination that he bred pit bulls, that his relationship with Garcia was based on having sold him pit bulls, and that his reason for going to Miami was to escort a pit bull for Garcia. Thus, Wolfe opened the door to the subject of his breeding and sale of pit bulls.

The government claims that it was justified in challenging Wolfe's credibility by inquiring into his knowledge about pit bulls. We agree that some questioning along these lines may have been appropriate. However, the questions regarding the use of pit bulls as guards for drug dealers went beyond the scope of Wolfe's direct testimony; no foundation had been laid to establish their relevance.

Even if this amounts to error, though, it does not rise to the level of reversible error. An error is harmless when it did not contribute to the conviction of the defend-

ant. *Chapman v. California*, 386 U.S. 18, 25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The challenged questions were merely cumulative on the issue of Wolfe's credibility. We do not think that these few questions had any discernible effect on the verdict in this case. The evidence regarding the elements of the crime, as discussed in the previous section, was quite convincing. In addition, there was enough other testimony regarding Wolfe's credibility to bring that credibility into question without this testimony. We cannot say that the challenged questioning contributed to the jury's determination of guilt. *Ibid.* Thus, it is not a basis for reversal.

V

For all of the foregoing reasons, we hold that the convictions of Garcia and Wolfe must be upheld. The search Garcia challenges was consensual; the evidence was sufficient to convict Wolfe; and any error relating to the questions Wolfe challenges was harmless. Thus, we AFFIRM.