904 F.2d 37
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antwon D. SMITH, Defendant-Appellant.
 No. 89-6278.
 United States Court of Appeals, Sixth Circuit.
 June 5, 1990.
 
 Before WELLFORD and BOGGS, Circuit Judges, and HORACE W. GILMORE,* District Judge.
 PER CURIAM.
 
 
 1
 Appellant Antwon Dwayne Smith was indicted under 21 U.S.C. Sec. 841(a)(1) (possession with intent to distribute a controlled substance), and 18 U.S.C. Sec. 1952 (the Travel Act). Following the denial of his motion to suppress evidence, Smith pled guilty to the possession count, and the Travel Act count was later dismissed. The issue before us on appeal bears upon the denial of his motion to suppress.
 
 
 2
 On November 29, 1988, officers of the Greater Cincinnati Airport Police were monitoring the arrival of a flight which originated in San Francisco and stopped in Salt Lake City prior to its arrival in Cincinnati. (Smith flew from Los Angeles to Salt Lake City, then to Cincinnati). Drug Enforcement Agency Officer David Bunning testified that he observed the appellant and two other men coming from the area of the flight's arrival gate. Bunning testified that the three men walked unusually fast, and that Smith's gait was unusual, as though he were carrying something in the seat of his pants.
 
 
 3
 Bunning testified that as the three men walked down the concourse, one of the men, Ricky Collins, stopped and looked up at an airport surveillance camera, then turned completely around and looked back down the concourse for several seconds. It appeared to Bunning that Collins was checking to see if they were being observed or followed. The three proceeded through the airport's main lobby and started down a staircase when one was heard to remark, "Wait a minute, my car is on the other side." All then turned around and headed toward the other side of the airport lobby. Bunning testified that as the men approached the escalator, Collins again stopped and looked around as he had previously done. According to the magistrate's report, Bunning's affidavit indicated that Collins turned around a third time before exiting.
 
 
 4
 Neither appellant nor his companions collected any baggage, and they walked out the airport door and approached a car with Pennsylvania plates. Bunning and another officer approached the men, identified themselves, and asked Smith if they could talk with him for a moment. Upon their request, Smith also handed his airplane ticket to Bunning. The ticket was issued in the name of D. Smith, and had been purchased with a credit card in the name of Happy Copeland, whom Smith identified as his aunt. Smith identified himself as Dwayne Smith, but neither he nor his companions were able to produce any identification whatsoever.
 
 
 5
 Bunning testified that when he asked Collins about the car, Collins stated that he had borrowed the car from a friend whose name he could not remember. (The car actually turned out to belong to Collins.) Bunning was told that they were picking up Smith to take him to the Hamilton, Ohio area to visit friends. Bunning testified that based on his past experience as a narcotics officer, he knew that drug couriers (1) frequently traveled under assumed names, (2) carried no identification, and (3) that Hamilton, Ohio was an area with a heavy concentration of crack and cocaine activity.
 
 
 6
 The remainder of Bunning's encounter with Smith and the others is a matter of controversy. Bunning testified that he informed Smith that he was a narcotics officer, and asked permission to search Smith's suitcase, coat, and person. Bunning maintains that he informed Smith that he had a right to refuse the search, but that Smith told him that he had nothing to hide, and that Bunning could go ahead and search. The search of the coat and suitcase revealed nothing.
 
 
 7
 Bunning testified that he again asked Smith for permission to search his person, and that Smith again agreed. Bunning testified that he then offered Smith the choice of having the search performed on the street, or in a nearby first aid room inside the airport used by DEA agents. According to Bunning, Smith then followed him into the room, and was again advised about his right to refuse permission to search. Smith, allegedly, again gave his permission. Bunning did tell Smith that if he refused, Bunning would attempt to obtain a search warrant. A pat-down search then revealed that Smith was carrying a plastic bag in his underwear containing what Bunning believed to be crack, and Smith was thus placed under arrest.
 
 
 8
 Smith and Collins testified at the suppression hearing, and, not surprisingly, their rendition of the events leading up to the search differs in many respects from Bunning's account. They dispute who walked before whom, how fast they walked, whether or not there was anything odd about Smith's gait, and why Collins turned around more than once. The most notable discrepancy between the account of Bunning and the accounts of Smith and Collins concerns the search of Smith personally. Smith and Collins maintain that Smith did not consent to the search of his undergarments. Collins testified that he never heard Smith give permission for the search of his bag, his coat, or his person.
 
 
 9
 Smith testified that he complained about racial harassment by Bunning and did not give the requisite consent. Smith also testified that Bunning never informed him of his right to refuse the search, and that he accompanied Bunning to the room inside the airport only because Bunning "told me to come with him. Like he was an authority, so I felt like I had to go." Asked whether he had believed himself to be under arrest, Smith responded, "I felt, I didn't really feel like I was under arrest, but I felt like I wouldn't refuse to go with him the way he said it." He testified that he did not believe he would be allowed to leave voluntarily.
 
 
 10
 Appellant claimed a Fourth Amendment violation in the hearing before the magistrate, asserting that Bunning lacked sufficient articulable facts to support an investigatory stop. He also alleged that the subsequent search was performed without consent. The magistrate, noting conflicting versions, first inquired into whether the officers had reasonable suspicion sufficient to justify an investigatory stop. Based on the testimony and demeanor of the witnesses (Smith, Collins, and Bunning), the magistrate resolved the credibility factor in Bunning's favor, and ruled against the motion to suppress. The magistrate outlined the evidence available to Bunning at the time he first approached Smith:
 
 
 11
 1. Collins' conduct on three separate occasions of stopping and looking around as if being followed;
 
 
 12
 2. Travel originating in a source city [Los Angeles] but diverted through non-source city [Salt Lake City];
 
 
 13
 3. Abnormal walking manner;
 
 
 14
 4. Walking at a fast pace through airport;
 
 
 15
 5. Retrieving no luggage.
 
 
 16
 Applying the totality-of-the-circumstances test outlined in United States v. Sokolow, 109 S.Ct. 1581 (1989), and United States v. Cortez, 449 U.S. 411 (1981), the magistrate concluded that Bunning had "at least a reasonable suspicion that Smith was carrying illegal drugs." Accordingly, the magistrate found that an investigative stop was permissible.
 
 
 17
 Noting a conflict in testimony as to whether Smith followed Bunning to the room where the search was performed, the magistrate concluded:
 
 
 18
 There certainly was no evidence that the officer coerced Smith into complying with his request, nor was the request preceded by Bunning in any way accusing Smith of being a drug courier. In fact, Smith conceded that he did not believe he was under arrest, but felt that his choices were limited because of the officer's tone of voice. No authority has been cited for this proposition, and in the context of these particular facts, a reasonable person would have believed that he was free to leave. U.S. v. Collis, 766 F.2d 219 (6th Cir.1985).
 
 
 19
 In sum, the magistrate found that the search was "consensual as described by Bunning," and recommended that the motion to suppress be denied, and this was adopted, over Smith's objections, by the district court.
 
 
 20
 The airport stop and search case involving suspicion of drug activity presents the courts with difficult issues. Each case has its own peculiar nuances, as does this one. Cases that seem identical at fist blush may be resolved in opposite directions because of these nuances. Compare Sokolow, supra; United States v. Mendenhall, 446 U.S. 544 (1980); Reid v. Georgia, 448 U.S. 438 (1980); and Florida v. Royer, 460 U.S. 491 (1983). See also United States v. $25,000, U.S. Currency, 845 F.2d 857 (9th Cir.1988); United States v. Garcia, 866 F.2d 147 (6th Cir.1989); United States v. Rose, 889 F.2d 1490 (6th Cir.1989) and United States v. Knox, 839 F.2d 285 (6th Cir.1988), cert. denied, 109 S.Ct. 1742 (1989).
 
 
 21
 After examination of the record, we are satisfied that no violation of the fourth amendment has been demonstrated. There was adequate basis for a stop of defendant and his companions, and we find no clear error in the district court's resolution of the consent issue.
 
 
 22
 We, accordingly, AFFIRM the conviction and the judgment of the district court.
 
 
 
 *
 THE HONORABLE HORACE W. GILMORE, Judge, United States District Court for the Eastern District of Michigan, sitting by designation